**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-290 (ACR)** |
| **v.** | : | |
| | : | |
| **CHAD DUSTIN SUENRAM,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Chad Dustin Suenram pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds (Count One). For the reasons set forth herein, the government requests that this Court sentence Suenram to 90 days of incarceration followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant Chad Suenram, the owner of a landscaping company near Wichita, Kansas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

The government's recommendation is supported by Suenram's decisions to: (1) enter the U.S. Capitol building while it was under siege, and once he was pushed out by police, enter a second time; (2) travel widely through the Capitol building, spending approximately 35 minutes inside; (3) remain on Capitol grounds even as police used chemical agents to try and disperse the crowd; and (4) celebrate the violence of the riot near the North Door, where he jubilantly cheered police officers' retreat inside the building. To this day, Suenram has no remorse for his actions - he repeatedly minimizes the violence that took place on January 6 and his role as a participant in the violent mob.

The Court must also consider that Suenram's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Suenram's crime support a sentence of 90 days of incarceration followed by a year of supervised release.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* statement of offense, ECF 25.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Suenram's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Suenram traveled alone from Wichita, Kansas to Washington D.C. on a private overnight charter bus. The purpose of his trip was to participate in the "March to Save America" rally. ECF 25 ⸢ 8. Suenram brought with him a face mask painted brightly with the American flag.

In the morning on January 6, 2021, Suenram arrived at the "Save America March" with the face mask and an American flag painted on the side of his head. Suenram attended former President Trump's speech at the Ellipse, and then walked with the crowd in the direction of the Capitol building. *Id.* at ⸢ 9.



Image 1: Suenram painted an elaborate American flag on the side of his head.

After crossing into the restricted perimeter near the Capitol building, Suenram joined a dense mob of rioters who had gathered around the scaffolding and staircase that led to Upper West Terrace. After rioters overran the police line, Suenram, wearing his face mask, followed the mob to the Upper West Terrace, where he approached the Capitol building by the Senate Fire Door.



*Image 2: Suenram joined the mob by the scaffolding on the Lower West Terrace.*



*Image 3: Suenram followed rioters up a staircase after the police line broke.*

Suenram was near the Senate Fire Door as it was violently breached when a rioter broke the glass on that door with his cane and then forced it open at 2:41 p.m.



*Image 4: Cheering the breach of the Senate Fire Door, Suenram followed rioters inside.*
*[Sent. Exh. 1 at 00:47]*

Suenram watched as a stream of rioters forced their way through the entrance, and he followed them, entering at 2:45 p.m. as fire alarms blared overhead. Suenram walked straight ahead down the corridor, filming the chaos on his cell phone.

At 3:00 p.m., roughly fifteen minutes after entering, Suenram – along with many of the other rioters who had entered through the Fire Door – was pushed back by police and forced out through the same door. As he exited, chemical irritants filled the hallway. The chemical irritants were so thick in the air that Suenram's eyes were affected by the chemical sprays—CCTV showed Suenram wiping his eyes and his sweatshirt was covered with particle matter from the sprays.



*Image 5: As Suenram exited the U.S. Capitol Building, an alarm blared overhead, and chemical irritants filled the air.  [Sent. Exh. 2 at 00:45-01:02]*

Undeterred by clear warnings signs that he was not permitted to be there, and ignoring the police presence, blaring alarms and chemical irritants in the air, Suenram re-entered the U.S. Capitol through the Senate Wing Door at 3:05 p.m.  CCTV shows Suenram raising his fist in celebration and videotaping with his cell phone as he entered.



*Image 6: Suenram was jubilant when entering the U.S. Capitol building a second time.*

Suenram then walked towards the Crypt, where he continued to film on his cellphone.  In the Crypt, Suenram joined a group of rioters who were yelling "USA, USA," all the while filming the events on his phone.



*Image 7: Suenram chanting in the Crypt.*

At approximately 3:13 p.m., Suenram exited the Capitol at the South Door Vestibule. Suenram was inside the U.S. Capitol building for roughly 35 minutes during his two entries.



*Image 8: Suenram exiting the U.S. Capitol Building*

After exiting the Capitol building a second time, Suenram chose to stay and participate further in the riot.  By roughly 3:35 p.m., Suenram had positioned himself in front of a large mob that was confronting police at the North Door in attempt to create a new breach into the Capitol building.  Suenram stood just feet away from beleaguered police officers as they were subjected to verbal abuse.  Police body worn camera captured Suenram pump his arm in the air and join other rioters in chanting "Treason! Treason!" to the police officers guarding the entrance.  *[Sent. Ex. 3 at 00:45]*



*Image 9:  Suenram joined a mob that harassed and overwhelmed police officers by the North Door.  [Sent. Exh. 3]*

At 3:49 p.m., rioters were directly and violently pushing into the bodies of the police officers who struggled to maintain the line.  *[Sent. Exh. 3 at 04:15]*.  As police fought the rioters back, a rioter fired bear spray directly in the faces of police guarding the North Door.  *[Sent. Exh. 3 at 04:35]*.  The physical confrontation quickly escalated.  Suenram, caught in the middle, put his hands on a police officer's arm as he helped another rioter retreat.  *[Sent. Exh. 3 at 04:47]*.



*Image 10: Suenram made contact with a police officer during an intense physical escalation.*

Suenram momentarily disappeared from the front of the line, but not for long.  Roughly one minute later, Suenram re-appeared —again at the front, but further down the police line.  *[Sent. Exh. 3 at 06:36]*.  Police officers, seeing they were vastly outnumbered, retreated inside the Capitol building.  The rioters, including Suenram, took advantage of the police officers' retreat to congregate directly in front of the Northwest Doors.  Police continued to attempt to clear the entrance, intermittently spraying chemical irritants from behind a closed door.

Suenram stood directly in front of the door for several minutes filming on his cellphone as police continued to release chemical irritants.  *[Sent. Exh. 4 00:00-03:40]*.  Suenram appeared jubilant throughout, waving his arms and cheering, and even at one point gyrating his body to music blaring in the background.  *[Sent Exh. 4 at 2:00]*.  Suenram then watched from a few paces away as other rioters began to pick up rocks and other heavy objects and throw them at the door. He then disappeared from the North Door area.





*Images 11-12: Suenram clearly enjoyed rioting by the North Door after police were forced to retreat inside.*

*Post-Guilty Plea Interview*

On August 23, 2024, after months of delay and numerous requests by the government to schedule the interview, Suenram agreed to sit down for the interview that was a condition of his plea agreement.  Suenram was not forthcoming during the interview, and largely used the interview to deny clearly established facts captured in video and minimize the seriousness of his actions.

Suenram stated that he traveled by himself from Wichita, Kansas.  Although Suenram was depicted in numerous videos standing alongside the same woman, he explained that they did not know each other and had only met on the bus.  Suenram, making a mockery of masking rules that were in place in January 2016, stated that he brought the American flag mask with him to Washington as a "Covid-19 mask."  He denied seeing any barriers when he approached Capitol grounds, and said he talked to multiple police officers.  He claimed that when he entered the Capitol building, he wasn't aware the Capitol building was "off limits" and he thought the Capitol "was open and we were allowed to be inside."  This was clearly false, given the blaring alarms by both the Senate Fire Door and Wing Door, and the heavy use of chemical irritants by police.  Suenram had no memory of hearing any fire alarms, seeing any doors be breached, or entering the Capitol building a second time, despite receiving CCTV footage that clearly shows Suenram entering the Capitol twice.  Remarkably, Suenram denied seeing anyone act violently towards police on January 6, despite receiving body worn camera footage and open-source video from the government that clearly showed the violence rioters inflicted upon police by the North Door while Suenram was present.  Suenram did concede more broadly that "some stuff shouldn't have happened" and some people were hurt on January 6, but he maintained that the riot was mostly peaceful.

*The Charges and Plea Agreement*

On August 23, 2023, the United States charged Suenram by a four-count Information with violating 18 U.S.C. § 1752(a)(1) & (2) and 40 U.S.C. 5104(e)(2)(D) & (G).  ECF 11.  Suenram failed to appear at the arraignment scheduled for September 11, 2023, and the arraignment was reset for September 29, 2023.  On November 1, 2023, Suenram, through counsel, informed the government that he intended to accept the government's plea offer and the government forwarded the signed plea paperwork to the Court.  ECF 19.  On December 4, 2023, the case was called for a change of plea hearing, but the hearing was continued after Suenram claimed to lack memory of details described in the Statement of Offense.  *Id.*  The case was called again for a change of plea on December 22, 2023, but a plea was again not entered after Suenram requested additional time to review the plea offer.  *Id.*  On January 31, 2024, the Court held a status conference and set a trial date.  On April 22, 2024, pursuant to a plea agreement, Suenram pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1).  ECF 24.  By plea agreement, Suenram agreed to pay $500 in restitution to the Architect of the Capitol.  ECF 24 ⁋ 12.

### III.    Statutory Penalties

Suenram now faces a sentencing for violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Suenram faces up to one year of imprisonment and a fine of up to $100,000.  Suenram must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49

(2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii) | +2 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Chapter Four Adjustment (U.S.S.G. §4C1.1) | <u>-2</u> |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 35-43.

The U.S. Probation Office accurately calculated Suenram's criminal history as a category I.  PSR at ¶ 49.  Accordingly, the U.S. Probation Office calculated Suenram's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0 months to 6 months.  PSR at ¶ 87.  Suenram's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.  This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.  In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Suenram's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Suenram, the absence of violent or destructive acts is not a mitigating factor.  Had Suenram engaged in such conduct, he would have faced additional criminal charges.

Some of the key factors in Suenram's case are that he entered the Capitol building after the Senate Fire Door was violently breached.  Despite the many clear signs that he was not permitted to be inside the Capitol—including chemical irritants, alarms, and police presence, he chose to enter a second time.  After exiting via the South Door Vestibule, rather than leave Capitol grounds, he positioned himself in front of a large mob by the North Door that was highly confrontational with police officers, who were clearly outnumbered.  After police were hit with bear spray and were forced to retreat inside, Suenram celebrated – cheering, dancing and raising his hands in celebration.  More than three years later, Suenram has expressed no remorse for his actions and has been untruthful about the violence he saw inflicted upon police at the North Door.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 90 days' incarceration in this matter.

### B. Suenram's History and Characteristics

As set forth in the PSR, in 2002—when Suenram was a 22-year-old member of the armed services, he was convicted of wrongful use of a controlled substance. Suenram was sentenced to 60 days of incarceration and received a "bad conduct" discharge from the military. PSR ¶ 45. According to the PSR, and despite the criminal conviction and open-source records confirming the bad conduct discharge, Suenram falsely maintains that he was honorably discharged from the military. PSR ¶ 69.

In 2005, Suenram pled guilty to sale or possession with intent to sell a controlled substance (cocaine) and was sentenced to 16 months of incarceration, all suspended. In 2006, Suenram was convicted of driving under the influence for a second time and was sentenced to 12 months, all suspended. In 2007, at age 27, Suenram was convicted of driving with a suspended license. He was sentenced to five days of incarceration, all suspended.

Suenram, is by all accounts, a good father who has custody over his four children and recently adopted a fifth child from the foster system. While the government appreciates that positive attribute, those characteristics did not stop the defendant from engaging in the crime in the first place.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Suenram's lack of remorse for his actions on January 6 clearly demonstrate the need for specific deterrence.  After numerous failed plea hearings and a reluctant decision to plead guilty, Suenram initially failed to cooperate with the U.S. Probation Office, leading to a delay in the drafting of the Presentence Investigation Report (PSR) and a significant delay in the scheduling of

his sentencing hearing.  He later failed to provide consent forms to Probation, so that Probation was unable to assess whether he is able to pay a fine in this case.  PSR ¶¶ 81-85.  Suenram still lacks any contrition for his action, and he continues to minimize the seriousness of what occurred that day.  If history were to repeat itself and there were to be another attack on this country's institutions and the peaceful transition of power, the government is confident that Suenram will again be at the front of the mob—cheering and utterly unrepentant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2]  This Court must sentence Suenram based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Suenram has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  This offense is a Class A misdemeanor. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The facts in Suenram's case are similar to those in *United States v. Dennis Adams,* 23-cr-396 (TSC). Adams pleaded guilty to violating 18 U.S.C. § 1752(a)(1), and he was sentenced by Judge Chutkan to 45 days of incarceration. In both cases, the defendants entered the Capitol building twice- through the Fire Door and then through the Senate Wing Door. In each case, the defendants ignored numerous warnings signs that they should not be at the Capitol building. After exiting a second time, both defendants joined rioters who overwhelmed police officers by the North Door. Adams was more restrained than Suenram, who jubilantly stood directly in front of the door, took videos and celebrated after police retreated inside. Adams, unlike Suenram, expressed genuine remorse for his actions and accepted responsibility quickly.

The facts in Suenram's case are also comparable to those in *United States v. Albert Ciarpelli*, 23-cr-398 (CKK). Ciarpelli, like Suenram, pleaded guilty to violating 18 U.S.C. § 1752(a)(1), and he was sentenced by Judge Kollar-Kotelly to 90 days of incarceration. Both defendants expressed no remorse for their conduct. Whereas Ciarpelli described his actions at the Capitol as a "little adventure," Suenram has repeatedly minimized his conduct and denied events (such as entering twice and witnessing violence) that are clearly captured on video. Both defendants entered the Capitol building twice and both had physical contact with officers. Whereas Ciarpelli put his hand on a bike rack that was pushed into officers, Suenram pushed on

18

the arm of a police officer who was trying to push back the crowd during a violent encounter by the North Door.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Suenram must pay $500 in restitution, which reflects in part the role Suenram played in the riot on January 6.[4] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Suenram's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *Id*.

## VII.    Fine

Suenram's conviction for violating 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of not more than $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

The burden is on the defendant to show present and prospective inability to pay a fine.  *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Suenram did not provide necessary consent forms to the probation officer, such that the Probation Office was unable to assess his ability to pay a fine.  PSR ¶ 85.  Because Suenram has not shown an inability to pay, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).  The guidelines fine range here is $200 to $9,500.  U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Suenram to 90 days of incarceration followed by one year of supervised release, 60 hours in community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Suenram's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Melanie Krebs-Pilotti*
Melanie Krebs-Pilotti
Trial Attorney- Antitrust Division
Cal Bar. No. 241484
601 D St., NW
Washington, D.C. 20001
melanie.krebs-pilotti2@usdoj.gov
(202) 870-7457


*/s/ Nialah Ferrer*
Nialah Ferrer
Assistant United States Attorney
New York Bar No. 5748462
601 D St., NW
Washington, D.C. 20001
Nialah.Ferrer@usdoj.gov
(202) 557-1490